UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

BRUCE ANDERSON,                          )
                                         )
            Plaintiff,                   )
                                         )
      vs.                                )        Case No. 4:12CV01066 ERW
                                         )
SHADE TREE SERVICES, CO., and            )
JEFFERY BISHOP,                          )
            Defendants.                  )

## MEMORANDUM AND ORDER

This matter comes before the Court upon Defendants Shade Tree Services, Co., and

Jeffrey Bishop's ("Defendants") Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56.

[ECF No. 33]. The matter has been fully briefed, and for the reasons that follow, the Court will

grant, in part, and deny, in part, Defendants' Motion.

## I. BACKGROUND

### A. Plaintiff's Employment with Shade Tree

Defendant Shade Tree Services Company ("Shade Tree") contracts with electrical utility

companies throughout the Midwest to trim and clear trees and other vegetation away from

electrical lines. [ECF Nos. 35, 42, at ¶ 1]. From February 14, 2005, through October 31, 2011,

Plaintiff Bruce Anderson ("Plaintiff") worked on, or supervised crews of ground workers and

treetrimers for Shade Tree. *Id.* at ¶¶ 2-3. Plaintiff was initially hired as a union crew foreman

and joined IBEW Local 2, the exclusive bargaining representative for Shade Tree's Foremen,

Trimmers, and Brushcutters in the Missouri districts where Plaintiff worked. *Id.* at ¶4. After a

little more than a year, in July 2006, Shade Tree promoted Plaintiff to the position of Supervisor

in its Capital District.[1]  [ECF Nos. 35, 42, at at ¶5).  Except for one client in another part of the

state, Shade Tree's only customer in Missouri was Ameren Union Electric Company d/b/a

Ameren Missouri ("Ameren").  *Id.* at ¶ 7.  Ameren required that Shade Tree submit personnel

time sheets for Shade Tree employees.  *Id.* at ¶ 9.  For the last two years that Anderson has held

the role of Capital District Supervisor, his Ameren supervising forester was Alisha Bewley-Davis.

*Id.* at ¶3. The parties dispute whether Plaintiff found Davis to be pickier and more inexperienced

than other foresters, resulting in conflict between them.  *Id.* at ¶¶15, 16.  Plaintiff admits that

Shade Tree received complaints about his job performance.  *Id.* at ¶17.  Plaintiff acknowledges

the content of the following documents:[2] (1) January 10, 2011 – Davis complained to her

supervisor at Ameren, Thomas Beerman, "I just want you to be aware that I am having some

issues with [Anderson]'s crews charging time inaccurately to Ameren. . . . I feel like this is going

on more often than I can track;" (2) January 10, 2011 – Davis wrote to Plaintiff complaining that

he had not yet turned in his timesheet for the week ending January 1, 2011 and implored, "Please

make sure you are getting me a copy of your timesheet every week; I'm tired of asking;" (3)

March 16, 2011 – Davis wrote to Plaintiff, "I have not received a timesheet from you since

January.  I have let you know on several occasions that you need to turn in weekly timesheets just

like your crews;" (4) May 3, 2011 - Davis wrote to Plaintiff at 6:34 a.m., requesting his line miles

and crew list and said, "I need these first thing this morning. To remind you, I need these on

---

[1]The parties dispute whether the position of supervisor was a union position.  In his
deposition, Plaintiff claims the supervisor position he took was a union position in which he
retained seniority.  [ECF No. 35-2, at 10].  Defendants state Plaintiff was promoted to the non-
union position of supervisor.  [ECF No. 35, at ¶ 5).  Plaintiff believed that Shade Tree paid dues,
and maintained his union status and seniority.  [ECF No. 46, at ¶¶ 80, 82].

[2]Plaintiff, while acknowledging the content of the emails, disputes the underlying accuracy
of them.  *Id.* at ¶ 18.

Monday of every week."  Plaintiff replied at 7:15 a.m., stating that he "had some difficulty with outlook last night;"  (5) May 3, 2011 - After Plaintiff did not submit his line miles until more than three hours later, Davis writes, "I am not happy about this being turned in so late."  Plaintiff replied with an excuse about the "large amount of work" he had; and (6) August 7, 2011 - Davis wrote to Plaintiff, "I don't think you turned in July Audits or W/E 7/30/11 timesheets to me on Friday like you said you would."  *Id.* at ¶18 (a) - (f).  Thomas Beerman, Ameren's managing supervisor of vegetation management [ECF No. 35-4, at 2], who had ultimate responsibility for overseeing Shade Tree's contract in much of Missouri, estimates that between January 2011 and September 2011, Davis escalated to his attention "more than ten" additional complaints specifically about Plaintiff.[3]  [ECF Nos. 35, 42, at ¶ 19].

Defendant Jeff Bishop ("Bishop") was Plaintiff's direct supervisor at Shade Tree until September 2, 2011 when Plaintiff was demoted.  [ECF No. 4, at ¶ 8].  During Plaintiff's time as a Supervisor, Bishop also counseled him about his ineffective communication.  [ECF Nos. 35, 42, at¶ 20].  As early as December 2009, Bishop began telling Plaintiff that he needed to improve his communication.  *Id.* at ¶ 21.  It is undisputed that Plaintiff was not given a formal warning regarding alleged performance problems, nor did his personnel file contain write-ups or disciplinary documents.  [ECF Nos. 41, 46, at ¶¶ 53-55].[4]

### B.  Plaintiff's FMLA Leave

[3]Plaintiff disputes the veracity and correctness of this allegation, but offers no reference to the record in support of his denial.  [ECF No. 42, at ¶ 19].

[4]Defendants argue, however, that it is not Shade Tree's policy to require a warning before demotion, and that Plaintiff was warned numerous times of his failure to meet expectations, particularly in the area of communications.  [ECF No. 46, at ¶ 53].

In September of 2009, Plaintiff injured his back in an on-the-job accident and was treated and prescribed pain medication by his physician. [ECF Nos. 41, 46, at ¶ 8].[5] In mid-June 2011, Plaintiff aggravated his back injury by lifting jugs into his truck. [ECF Nos 41, 46, at ¶ 25]. On Monday, June 20, 2011, Plaintiff emailed Bishop, his immediate supervisor, and Davis, his supervising Ameren forester, to tell them that he was going on a medical leave of absence for at least two weeks. [ECF Nos. 35, 42, at ¶¶ 23 - 24]. In that email, he explained that he was having emergency surgery "due to a herniation." *Id.* at ¶ 25. Davis replied later that evening, saying simply, "Okay. Good luck." *Id.* at ¶ 26. Bishop approved the requested time off, but objected to the lack of any advance notice, writing: "Don't mind the absence just the lack of communication." *Id.* at ¶ 28. Plaintiff further explained that he had hurt his back badly lifting chemicals out of his truck and that he had already gone to the hospital. *Id.* at ¶ 29. Bishop then emailed Plaintiff, stating that he would need to submit a workers' compensation report for the incident and that Bishop was "more worried about the deception." *Id.* at ¶ 30. Plaintiff assured him that no worker's compensation report was necessary because he had hurt himself at home after work. *Id.* at ¶¶ 30, 31.[6] However, Plaintiff later testified at his deposition that he ***had*** lied in his email– the truth was that he had actually hurt himself at work.[7] [ECF Nos. 35, 42, at ¶ 32]. In response to

[5]It is undisputed that Plaintiff was diagnosed in 2009 with a lumbar disc herniation, and surgery was recommended as a first option, and a course of pain management, in combination with physical therapy and cortisone shots as an alternative. [ECF Nos 41, 46, at ¶¶ 15, 17]. Plaintiff selected the alternative course of pain management as he could not afford an extended absence from work. *Id.* at ¶ 18.

[6]Plaintiff acknowledges that "the documents say this but denies the veracity and correctness of the underlying facts or any implications thereof. *Id.*

[7]Plaintiff explains that his lie was motivated by a fear of being punished by Shade Tree for claiming an injury on the job. [ECF No. 42, at ¶ 32]. In his Statement of Uncontroverted Material Facts, Plaintiff further alleges that Bishop requested that he turn the injury in to his own insurance, but the cited excerpt from his deposition testimony does not support this contention.

Plaintiff's June 20, 2011 email regarding his need for leave, Bishop replied that he had "concerns with current communication." *Id.* at ¶ 33. Plaintiff did not have emergency back surgery on or around June 20, 2011. *Id.* at ¶ 34. Instead, at the direction and recommendation of his doctors, he checked into an inpatient drug treatment program at the Boonville Rehab Center because of an addiction to the opiate painkiller, Vicodin, which he had been taking since 2009.[8] [ECF Nos. 35, 42, at ¶ 35; 41, 46, at ¶¶ 27-30].

According to Plaintiff, his Vicodin addiction did not adversely affect his personal life or his work. [ECF Nos. 35, 42, at ¶ 36]. Instead, he chose to go to "detox" at the recommendation of his surgeon as a necessary precursor to back surgery. *Id.* at ¶ 37. On the next morning, June 21, 2011, after sending his email indicating he needed leave for surgery, Plaintiff telephoned Bishop to explain his new treatment plan. *Id.* at ¶39. He participated in a treatment program for eight days, and then checked himself out. *Id.* at ¶¶ 42-43. His Discharge Summary from the rehabilitation clinic states that Plaintiff's "participation in the treatment program was erratic," and that "his prognosis is poor." *Id.* at ¶ 44. The medical staff wanted him to stay longer.[9] [ECF Nos. 35, 42, at ¶ 43]. Shortly after, Plaintiff and Bishop met to discuss his return to work. *Id.* at ¶ 45. Plaintiff assured Bishop that his addiction was not to illegal drugs, showed him materials from the clinic, and related that he was doing well with his rehab. *Id.* at ¶ 46. Bishop told him ". . . come back to work, and everything [is] going to be fine. Don't worry, I will take care of everything. . .

---

*See* [ECF Nos 41, at 11; 40-2, at 5].

[8]Plaintiff alleges that he took Vicodin "as needed." [ECF No. 42, at ¶ 35]. Defendants argue however, that Plaintiff's statement is not supported by the record and inconsistent with Plaintiff's claim of *addiction* to Vicodin during the time frame relevant to this suit. [ECF No. 46, at ¶ 10].

[9]Plaintiff does not actually dispute this fact, but adds that the staff wants *everyone* to stay for thirty days. [ECF No. 42, at ¶ 43].

." *Id.* at ¶ 47. The next morning, Plaintiff showed up to work and "didn't skip a beat." *Id.* at ¶ 48. Neither Plaintiff, nor Bishop, told Davis that Plaintiff was addicted to any drug or that he had gone to a drug rehab clinic during his leave. *Id.* at ¶ 49. Bishop later told Thomas Beerman that Plaintiff had gone to the rehab clinic.[10] [ECF Nos. 35, 42, at ¶ 50]. No one at Shade Tree ever told Beerman or Davis, explicitly or implicitly, that Plaintiff used **illegal drugs**.[11] *Id.* at 51. In addition to Beerman, Bishop also told an area manager at Shade Tree, James Risch, and Shade Tree president, Jim Baker, that Plaintiff had been in rehab or "detox." [ECF No. 46, at ¶¶ 35, 38]. Bishop, however, did not indicate to anyone that Plaintiff's leave was related to *prescription medicine* use. [ECF Nos. 41, 46, at ¶ 40].

### C. Plaintiff's Demotion and Layoff

As noted earlier, several emails from Davis highlight her communication concerns involving Plaintiff. In particular, on August 7, 2011, an email identified that Plaintiff failed to turn in a timesheet and audit on time. [ECF Nos. 35, 42, at ¶ 52]. Furthermore, Plaintiff and Davis clashed over billing issues, concerning a route sheet. [ECF Nos. 35, 42, at ¶ 53]. Davis began to question Plaintiff's integrity. *Id.* at ¶ 54. She became so upset on a phone call with Plaintiff that she raised her voice, vowed to call Beerman, and ultimately hung up on Plaintiff because she felt that he was lying about the information that he was relaying to her from Bishop. *Id.* at ¶¶ 55-56. After this August 25th phone conversation, Plaintiff asked Bishop to transfer him away from

---

[10]Plaintiff disputes Beerman's testimony [ECF No. 35-6, at 19] that he has no recollection of this and never told Davis. [ECF No. 42, at ¶ 50].

[11]Plaintiff denies this statement, as to Beerman only, arguing that he knew, explicitly or implicitly, the real reason Plaintiff was on leave. [ECF No. 42, at ¶ 51]. As Plaintiff's denial seems to refer to his detox for *vicodin* (the "real reason" Plaintiff "was out on leave"), and not *illegal drug* use, the Court finds that Plaintiff did not specifically contravert Defendants' statement, and therefore, deems it admitted for purposes of summary judgment.

Davis. *Id.* at ¶ 57. Plaintiff , however, has never contended that Davis's treatment of him had anything to do with his FMLA leave. *Id.* at ¶ 58.

In addition to conflict with Davis, Ameren's Beerman was concerned that there were multiple instances where Plaintiff did not respond in a timely manner to a customer inquiry. *Id.* at ¶ 61. Beerman and Davis followed up on their concerns regarding Plaintiff at their quarterly performance meeting in late August, at which Shade Tree area manager, James Risch, Bishop, and Plaintiff were present. *Id.* at ¶ 62. The topic of Plaintiff's FMLA leave did not come up in this meeting. *Id.* at ¶ 66.

Although concerned about Plaintiff's performance, it is undisputed that Ameren does not have the power to specifically require that Shade Tree remove an employee from any position. *Id.* at ¶ 68. James Risch, area manager at Shade Tree, and supervisor of Bishop [ECF No. 35-1, at 3], had the authority to demote Plaintiff; Bishop did not. [ECF Nos. 35, 42 at ¶ 74]. Risch decided to remove Plaintiff from the position of Supervisor. *Id.* at ¶ 72. Risch stated that he felt, after the 30th complaint by Ameren, that Shade Tree would be better off if it assigned a different supervisor to Plaintiff's Capital District, and this concern was bolstered by his knowledge that Ameren could take the Capital District away from Shade Tree and give it to one of its competitors at will. *Id.* at ¶¶ 67, 69-70. After Ameren complained at the aforementioned quarterly performance meeting, Risch told Bishop, "[there's] nothing else we're going to do, we're going to have to replace him." *Id.* at ¶ 73. Risch further stated that immediate removal was required – as opposed to some kind of warning or suspension – because, "it was my decision and I believed it had already gone too far." *Id.* at ¶ 75. Bishop contacted Plaintiff to deliver the news on or about Friday, September 2, 2011, and he offered Plaintiff a foreman position in the adjacent Little Dixie District. *Id.* at ¶¶ 78-79. The foreman position was within the jurisdiction of the IBEW

collective bargaining agreement. *Id.* at ¶ 80. Plaintiff's new position did not require day to day interaction with Ameren. *Id.* at ¶ 77.[12] In an email exchange on September 5, 2011, the Monday following his demotion, Plaintiff asked, "Am I being demoted because of the two weeks for my personal leave I took off that you and [Beerman] talked about a week ago?" [ECF Nos. 35, 42 at ¶ 82]. Bishop replied, "Not really / More about the communication around it and other issues / Suggest that is where the correction should begin." *Id.* at ¶ 83. It is undisputed that Bishop told Plaintiff that his job may not be secure because of the time Plaintiff had taken off as leave. [ECF No. 46, at ¶ 45]. Additionally, Bishop told Plaintiff that he could not be trusted to investigate an incident because of Plaintiff's medical leave and drug addiction. *Id.* at ¶ 46. When asked whether there was anyone Risch has retaliated against because they took medical leave, or discriminated against because they underwent drug treatment, Plaintiff replied "No." [ECF No. 35-2, at 85].

In 2011, leading up to Plaintiff's termination, Ameren realized that it was overspending on its vegetation budget. [ECF Nos. 35, 42 at ¶ 91]. This meant that the supervising foresters at Shade Tree would have to make adjustments to their various projects. *Id.* at ¶ 93. Ameren did not notify Shade Tree of the cuts would take place until the end of October. *Id.* at ¶ 94. Shade Tree shifted some workers to Franklin District for workload reasons before learning of any Ameren budget problems. *Id.* at ¶ 95. Ameren communicated to Shade Tree that the cuts that would affect projects in the Little Dixie and Capital Districts, among other Missouri locations.[13] *Id.* at ¶ 96. Ameren expected Shade Tree to make the necessary staffing adjustments. *Id.* at ¶ 97.

---

[12]Shade Tree also contends that it sent Plaintiff to another district because "it did not feel right to have Plaintiff working on the same crew with workers he had supervised days earlier." [ECF No.35 at ¶ 81].

[13]Although Plaintiff attempts to dispute this statement by contending that Shade Tree makes adjustments at their discretion, he cites to testimony by Beerman, *confirming* Defendants' statement. *See* [ECF No. 40-7, at 9-10].

Shade Tree laid off approximately 12 union workers within the affected Districts. [14] *Id.* at ¶ 98; *See also* ECF No. 35-3, at 43-47. Shade Tree's agreement with IBEW (the "CBA") provided that whenever there needed to be a reduction in forces, it had to be done by seniority: "Seniority will prevail according to the period of continuous service with the Employer covered by this Agreement in adding to or reducing the forces." [ECF Nos. 35, 42, at ¶ 99]. The CBA provided:

> **Section 23.**
>
> When men are transferred to jobs outside of the jurisdiction covered by this Agreement, *they shall maintain their seniority provided they return to work for a minimum of eight (8) hours,* in the jurisdiction of the Union within twelve (12) months. It shall be at the option of the employee to accept or reject such temporary transfers and on such work the wages as set forth in this Agreement shall be paid or a higher rate if such is in effect in the territory where the work is being performed. Employees working outside the bargaining unit as supervisors for signatory contractors shall be covered by the provisions of this section.

*Id.* at ¶ 101. (emphasis added). Plaintiff did not return to do at least eight hours of bargaining unit work each year while he was a Shade Tree Supervisor.[15] *Id.* at ¶ 102. Accordingly, the October 28, 2011 union seniority list had Plaintiff's seniority as though he were a new-hire on September 5, 2011, the date he returned to Little Dixie as a foreman. *Id.* at ¶ 103. Of the twelve

---

[14]Although Defendants' statement did not allege how long the workers were laid off, Plaintiff argues that all 12 workers were not laid off or terminated *indefinitely*. [ECF No. 42, at 98].

[15]Plaintiff fails to fully dispute this fact, only offering that he admits that Risch *believed* Plaintiff "did not do what was needed to maintain his union status." *Id.* at ¶ 102.

workers laid off, Plaintiff had the lowest union seniority date.[16]  [ECF Nos. 35, 42, at ¶¶100, 104]; *See also* [ECF No. 35-3, at ¶¶ 43-47].  Plaintiff never filed a grievance with the Union, and remains eligible for rehire.  [ECF Nos. 35, 42, at ¶¶ 104, 106].

### D.  Plaintiff's Slander Allegations

During the two months following his demotion, Plaintiff claims that Bishop told a Shade Tree supervisor, James Ferguson, a series of false statements about his job performance.  *Id.* at ¶ 87.  Ferguson told Plaintiff that Bishop told him that Plaintiff had improperly documented his time, stolen Shade Tree equipment, not completed enough work, and failed to appropriately request vacation days.  *Id.* at ¶ 88; [ECF No. 46, at ¶ 47].  Ferguson also told Plaintiff that if Plaintiff had not been on drugs, stolen company equipment, and lied to everyone, he might still be supervisor.  [ECF No. 46, at ¶ 50].  Plaintiff contends these statements are false, but admits he did not hear *Bishop* say them, and he does not know of anyone else to whom Bishop made the statements.[17]  [ECF Nos. 35, 42, at ¶ 89].  Plaintiff claims that Bishop told officers at Ameren and other employees at Shade Tree that Plaintiff had been in detox. [ECF No. 46, at ¶¶ 36, 38].   As noted above, it is undisputed that Bishop told Beerman (at Ameren), Risch and the president of Shade Tree that Plaintiff had been in rehab/detox.  *Id.* at ¶¶ 36, 38, 39.   Plaintiff argues that because Bishop did not specifically identify prescription drugs, it can be *inferred* that his addiction was to illegal drugs.  [ECF No. 42, ¶ 90].

### E.  Procedural History

---

[16]Although Plaintiff disputes this contention, Plaintiff references his Exhibit 14, which actually establishes Plaintiff's low seniority date.  *See* ECF No. 40-14, at 1-3.

[17]Plaintiff fails to specifically controvert this statement as he merely restates that *Ferguson* told him (Plaintiff) directly that Bishop made these statements.  *Id.* at  ¶89.

Plaintiff originally filed this suit against Defendants Shade Tree Services, Co. and Jeff Bishop ("Defendants") in the Circuit Court of St. Louis County, Missouri, asserting claims for violation of the Missouri Human Rights Act, wrongful discharge, and slander [ECF No. 1-1]. Defendants timely removed the action to this Court pursuant to 28 U.S.C. §§ 1441(a) and (c) on the basis that Count II of the complaint alleges a violation by Defendants of anti-termination provisions of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2612 *et seq.*[18] Defendants filed the instant Motion on May 10, 2013, seeking summary judgment in their favor on all three counts in Plaintiff's petition, as well as an award of costs and expenses incurred, and further relief as the Court deems proper.

## II.  LEGAL STANDARD

Motions for summary judgment essentially "define disputed facts and issues and ... dispose of unmeritorious claims [or defenses]." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses...."). Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no *genuine* issue of *material* fact and that the moving party is entitled to a judgment as a matter of law." *Id.*; Fed. R. Civ. P. 56(c) (emphasis added); *see Woods v. DaimlerChrysler Corp.,* 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the

---

[18]This Court denied Plaintiff's Motion to Remand, concluding that because the FMLA provides the exclusive remedy for a wrongful termination claim based upon medical leave taken pursuant to the FMLA, Count II invokes a federal question, and this Court has subject matter jurisdiction under 28 U.S.C. § 1441(a).  [ECF No. 17].

light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.").

A fact is *material* when it " 'might affect the outcome of the suit under the governing law.' " *Johnson v. Crooks,* 326 F.3d 995, 1005 (8th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). Thus, "the substantive law will identify which facts are material." *Anderson,* 477 U.S. at 248. Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.* An issue of material fact is *genuine* if it has a real basis in the record, *Hartnagel v. Norman,* 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986)), or when " 'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods,* 409 F.3d at 990 (quoting *Anderson,* 477 U.S. at 248); *see Diesel Machinery, Inc. v. B.R. Lee Indus., Inc.,* 418 F.3d 820, 832 (8th Cir. 2005) (stating genuineness depends on "whether a reasonable jury could return a verdict for the non-moving party based on the evidence"). Evidence presented by the nonmoving party that only provides "some metaphysical doubt as to the material facts," *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348, such as a "scintilla of evidence," *Anderson,* 477 U.S. at 252; *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.,* 113 F.3d 1484, 1492 (8th Cir. 1997), or evidence that is "merely colorable" or "not significantly probative," *Id.* at 249-50, does not make an issue of material fact genuine.

Thus, a *genuine issue of material fact* is not the "mere existence of some alleged factual dispute between the parties." *State Auto. Ins. Co. v. Lawrence,* 358 F.3d 982, 985 (8th Cir. 2004). " " "Instead, "the dispute must be outcome determinative under prevailing law." ' " *Mosley v. City of Northwoods,* 415 F.3d 908, 910-11 (8th Cir. 2005) (quoting *Get Away Club, Inc. v. Coleman,* 969 F.2d 664, 666 (8th Cir. 1992), in turn quoting *Holloway v. Pigman,* 884 F.2d 365,

366 (8th Cir. 1989)). In other words, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson,* 477 U.S. at 248-49. Essentially, a genuine issue of material fact determination, and thus the availability of summary judgment, is a determination of "whether a proper jury question [is] presented." *Id.* at 249. A proper jury question is present if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

Procedurally, the moving party does not have to "support its motion with affidavits or other similar materials *negating* the opponent's claim," *Celotex,* 477 U.S. at 323, but the moving party does bear "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel,* 953 F.2d at 395 (citing *Celotex,* 477 U.S. at 323). Thus, a movant need only demonstrate the absence of a genuine issue of material fact and that it is entitled to judgment according to law. *See Celotex,* 477 U.S. at 323 ("[T]he motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Mosley,* 415 F.3d at 910 ("The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.' " (quoting *Krenik v. County of Le Sueur,* 47 F.3d 953, 957 (8th Cir. 1995))). If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing

party is "entitled to judgment as a matter of law." *Celotex,* 477 U.S. at 322; *In re Temporomandibular Joint,* 113 F.3d at 1492.

In considering whether a genuine issue of material fact is present, the court must view all the evidence in the light most favorable to the nonmoving party. *Matsushita,* 475 U.S. at 587-88; *Mosley,* 415 F.3d at 910. Further, the court must give such party the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita,* 475 U.S. at 587-88. However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.,* 383 F.3d 779, 784 (8th Cir. 2004). Rather than "attempt[ing] to determine the truth of the matter ... the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.,* 90 F.3d 1372, 1376-77 (8th Cir. 1996).

Of course, the facts are not the sole concern of the court; after all, a genuine issue of material fact necessarily depends on the substantive law. *See Holloway,* 884 F.2d at 366 ("The presence of a genuine issue of fact is predicated on the existence of a legal theory which can be considered viable under the nonmoving party's version of the facts. The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law."). Thus, the relevant law concerning plaintiff's claims is pivotal. *Anderson,* 477 U.S. at 252 ("[T]he inquiry involved in a ruling on a motion for summary judgment ... necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."); *see Brandon v. Lotter,* 157 F.3d 537, 539 (8th Cir. 1998) (" 'In ruling on a motion for summary judgment, the court must bear in mind the actual quantum and quality of proof necessary to support liability under the applicable law.' " (quoting *Hartnagel,* 953 F.2d at 396)). Even if no genuine issue of material fact is present, summary judgment is not appropriate

unless the governing law supports the moving party's position. Fed. R. Civ. P. 56(c) (requiring the moving party to show that it "is entitled to judgment as a matter of law"). Moreover, summary judgment is particularly appropriate "where the unresolved issues are primarily legal rather than factual." *Aucutt v. Six Flags Over Mid-America, Inc.,* 85 F.3d 1311, 1315 (8th Cir. 1996).

### III. DISCUSSION

#### A. Count I - Violation of the Missouri Human Rights Act

##### 1. Plaintiff's Addiction as a "Contributing Factor" in his Demotion or Layoff

Plaintiff alleges that Defendant Shade Tree violated the Missouri Human Rights Act, Mo. Rev. Stat. § 213.055 ("MHRA"), by demoting and firing Plaintiff, based, at least in part, on his disability of prior addiction to pain medications prescribed to him by his physician, and on Shade Tree's erroneous belief of his prior illegal use of drugs. [ECF No. 1-1, at 9]. Similarly, Plaintiff alleges that Defendant Bishop violated the § 213.055 of the "MHRA", by encouraging and participating in the demoting and firing of Plaintiff based, at least in part, on his disability of prior addiction to pain medications prescribed to him by his physician, and on its erroneous belief of his prior illegal use of drugs. *Id.*

Defendants argue that Plaintiff has not, and cannot show, any facts or evidence that his purported disability was a contributing cause for his demotion or termination in violation of the MHRA. [ECF No. 34, at 2]. Additionally, Defendants maintain that Plaintiff did not have a cognizable disability that afforded him protection under the FMLA. *Id.* at 3.

Plaintiff brought his claim under under section 213.055, the section of the MHRA that prohibits employers from engaging in discriminatory employment practices, including wrongful

termination.  The MHRA defines "discrimination" to include " ***any*** unfair treatment based on race, color, religion, national origin, ancestry, sex, age as it relates to employment, **disability**, or familial status as it relates to housing."  Section 213.010(5) (emphasis added).  Nothing in the statutory language of the MHRA requires a plaintiff to prove that discrimination was a substantial or determining factor in an employment decision; if consideration of age, disability, or other protected characteristics contributed to the unfair treatment, that is sufficient.  *See McBryde v. Ritenour Sch. Dist.,* 207 S.W.3d 162, 170 (Mo. App. 2006).

The Missouri Supreme Court has determined that the MHRA may offer greater discrimination protection than that available under federal standards, and that federal case law, contrary to the plain meaning of the MHRA, should not be applied to cases under the statute. *Daugherty v. City of Maryland Heights,* 231 S.W.3d 814, 818 (Mo. 2007).  This distinction led the Missouri Supreme Court to abandon the *McDonnell Douglas* burden-shifting analysis[19] in MHRA cases, applying instead a standard derived from Missouri's approved pattern jury instruction, MAI 31.24.  *Id.* at 820.  Under this standard, an MHRA discrimination claim survives summary judgment only "if there is a genuine issue of material fact as to whether [the protected characteristic] was a 'contributing factor' in [defendant's] termination decision."  *Quinn v. St. Louis Cnty.*, 653 F.3d 745, 751 (8th Cir. 2011) (citing MAI 31.24); *see also McCullough v. Commerce Bank,* 349 S.W.3d 389, 398 (Mo. Ct. App. 2011) (discussing and applying *Daugherty); Korando v. Mallinckrodt, Inc.,* 239 S.W.3d 647, 649 (Mo. Ct. App. 2007) (citing *Daugherty* for the proposition that "the McDonnell Douglas burden shifting analysis no longer applies" and "the proper analysis for summary judgment cases under the MHRA applies the MAI

---

[19]The rejected federal standard is set forth in *McDonnell Douglas Corp v. Green,* 411 U.S. 792, 802–03 (1973).

31.24 'contributing factor' standard"). This standard offers greater protection than the federal one because a "contributing" factor need only have "a part in producing the [discriminatory] effect." *Williams v. Trans States Airlines, Inc.,* 281 S.W.3d 854, 867 (Mo. Ct. App. 2009) (internal quotations omitted); *see also Holmes v. Kansas City Mo. Bd. of Police Comm'rs,* 364 S.W.3d 615, 627 (Mo. Ct. App. 2012). If "the record shows two plausible, but contradictory, accounts of the essential facts and the 'genuine issue' in the case is real, not merely argumentative, imaginary, or frivolous," a plaintiff will have demonstrated the existence of a contributing factor for purposes of a motion for summary judgment. *Daugherty,* 231 S.W.3d at 820; *see also Marez v. Saint–Gobain Containers, Inc.,* 740 F. Supp.2d 1057, 1068 (E.D. Mo. 2010).

Defendants argue that Plaintiff's demotion was caused by his deteriorating relationship with Ameren's Davis, who knew nothing of his addiction. [ECF No. 34, at 5]. According to Defendants, because Shade Tree demoted Plaintiff in response to "Davis's untainted criticism, [Plaintiff's] disability was not a contributing factor to his demotion." *Id.* Defendants state there is nothing in the record to establish that Davis ever found out about Plaintiff's drug addiction or treatment. [ECF No. 34, at 5]. It is undisputed that neither Plaintiff, nor Bishop, told Davis about Plaintiff's rehab or addiction. Although Plaintiff emailed Davis regarding his leave, he mentioned his herniation as the reason, not his addiction to vicodin. At the quarterly August performance meeting, Beerman and Davis communicated their complaints about Plaintiff, but the topic of his rehab did *not* come up. As noted earlier in the Background section, Ameren's Davis and Beerman articulated complaints regarding the timeliness of Plaintiff's submissions to Ameren, his responses to customer inquiries, as well as his unreliable communication. Davis's dissatisfaction with Plaintiff's performance is detailed in several emails, some of which pre-date

his rehab. Defendants contend that Risch, who undisputedly had the authority to demote Plaintiff, was concerned that Ameren could take Plaintiff's Capital District away from Shade Tree due to their dissatisfaction with Plaintiff's performance. Defendants further offer testimony that Ameren had done this in the past. *See* ECF No. 35, at ¶ 71. Defendants also maintain that Risch's decision to demote Plaintiff was therefore free from discriminatory motivation, and ultimately served the other employees working in the Capital District. [ECF No. 34, at ¶ 6]. Further, Plaintiff admits he found Risch to be fair, and believed that Risch had not discriminated against anyone in the past.

Even if Defendants could establish with the above evidence, that Davis's criticisms were untainted by any knowledge of Plaintiff's addiction or treatment, the Court does not find that this creates the absence of a genuine issue of material fact for the purposes of summary judgment. Defendants rely on *Porter v. Lake Lotawana*, 651 F.3d 894, 898-99 (8th Cir. 2011), in which the court found that plaintiff's protected activity was not a contributing factor to her discharge because it was undisputed that the decision maker was unaware of her complaint. [ECF No. 34, at 5]. However, Defendant's reliance on this case is misplaced, as here, Davis was not the "decision maker" in Plaintiff's demotion. Risch *was*, and he undisputedly knew of Plaintiff's addiction.

Furthermore, the Court does not find that there is a genuine issue of material fact as to whether Plaintiff's addiction was a contributing factor in his demotion and ensuing layoff. Defendants argue that summary judgment is appropriate as Shade Tree's motivation in demoting Plaintiff was clear and unmistakable, and free of discrimination. Defendants contend that Risch was acting upon Ameren's complaints. [ECF No. 34, at 7]. However, the Court also notes that it is undisputed Bishop did tell Plaintiff that his time in rehab may have affected his job security.

Additionally, Bishop stated that Plaintiff could not be trusted to investigate an incident at work due to his medical leave and drug addiction. Plaintiff also contends that a Shade Tree supervisor, Kerri Halker, told Plaintiff he would "never work at Shade Tree again because of his drug problem and because of Bishop's personal dislike of Plaintiff." [ECF No. 46, at 11].[20] Defendants argue that these statements cannot be linked as a contributing factor to Risch's decision to demote Plaintiff, and that even if Bishop bore some animus there is no evidence that he influenced Risch's decision-making process. [ECF No. 34, at 7].

The Court, however, finds that Plaintiff's addiction to Vicodin could be construed as a "contributing factor" in his demotion under Missouri's liberal standard governing MHRA claims. Viewing the evidence presented in a light most favorable to the non-movant, it is reasonable to infer that Risch could have been influenced by his own knowledge of Plaintiff's addiction, combined with the complaints from Ameren. It is also possible that the statements regarding Plaintiff's addiction, performance, and job security made by Bishop, Plaintiff's supervisor, reflected Risch's opinion, or influenced his decision to demote Plaintiff. Although an alternate reason for Plaintiff's discharge has been proffered by Defendants, the Court cannot say, considering the evidence in a light most favorable to Plaintiff, that the facts alleged could not support a reasonable inference in favor of the non-movant, that Plaintiff's addiction and subsequent treatment played a part in producing the adverse employment action. *See Lynn v. Deaconess Med. Ctr.-W. Campus,* 160 F.3d 484, 487 (8th Cir. 1998) ("Summary judgment should not be granted unless evidence could not support any reasonable inference for the non-

---

[20]Defendants dispute the accuracy of this contention, claiming instead that union seniority rules determined the recall of Plaintiff from layoff. *Id.* As all inferences are to be drawn in favor of Plaintiff in construing Defendants' Motion, the Court will consider Plaintiff's allegation of discriminatory animus.

movant."). Thus, as there is a genuine issue of material fact as to whether Plaintiff's addiction was a contributing factor in his demotion and the layoff that followed, summary judgment is precluded on this basis related to Plaintiff's MHRA allegations.

### 2. Plaintiff's Addiction as a Cognizable Disability under the MHRA

Defendants contend that even if there were some causal connection between Plaintiff's demotion and his addiction, the MHRA claim still fails as he does not have a covered disability under the Act. Under the MHRA, "the term 'disability' does not include current, illegal use of or addiction to a controlled substance as such term is defined by section 195.010.[21] Missouri Human Rights Act, Mo. Rev. Stat. § 213.010(4). Defendants maintain that under the MHRA, Plaintiff was currently addicted to Vicodin, a controlled substance, at the time of his demotion. Defendants note that it is undisputed that Plaintiff took a Vicodin pill and entered rehab on June 21, 2011. They maintain he was currently addicted ten weeks later on September 2, 2011, the day he was informed of his demotion, as "breaks of weeks or months are insufficient to qualify as past drug use." [ECF No. 34, at 9]. Although Plaintiff opposes this contention, he does not offer any caselaw in support of the proposition that the ten weeks of alleged non-use between rehab and his demotion are sufficient to establish that he is *not currently* using a controlled substance. Additionally, Defendants argue that Plaintiff's stint in rehab militates in favor of a finding of current use, as Plaintiff checked himself out earlier than recommended, and his discharge noted that his participation was "erratic," and his progress was "poor." *Id.* at 11. Plaintiff counters that

---

[21]"[H]owever, a person may be considered to have a disability if that person: (a) Has successfully completed a supervised drug rehabilitation program and is no longer engaging in the illegal use of, and is not currently addicted to, a controlled substance or has otherwise been rehabilitated successfully and is no longer engaging in such use and is not currently addicted; (b) Is participating in a supervised rehabilitation program and is no longer engaging in illegal use of controlled substances; or (c) Is erroneously regarded as currently illegally using, or being addicted to, a controlled substance." Mo. Rev. Stat. § 213.010(4).

he was *not* "currently" addicted after rehab, stating that he has not been addicted to any medication since being admitted, and has only taken over-the-counter medications, such as Tylenol and Ibuprofin, for his continued pain. [ECF No. 41, at ¶¶ 33-34]. Defendants, however, point out, in contradiction to these contentions in Plaintiff's Statement of Uncontroveted Material Facts, that Plaintiff's deposition testimony states that, on October 14, 2011, he went to the emergency room, seeking treatment for his use of the prescription painkiller, Tramadol. [ECF No. 46, at ¶¶ 33-34]. The emergency room medical records indicate, however, that Plaintiff had begun taking *Vicodin* again. *Id.* Plaintiff offers only his own statement that the records are erroneous, and should have indicated *Tramadol. Id.* Plaintiff explained that Tramadol was a "not-so-potent Vicodin, and answered in the affirmative when asked if he had become physically dependent on Tramadol." [ECF Nos. 45, at 3; 46, at ¶ 33].

As it is undisputed that Plaintiff was addicted to a controlled substance at the time he entered rehab, the question before the Court is whether his use was "current," excluding it from disabilities covered by the MHRA, and rendering summary judgment proper on the instant claim. Clearly, if the October hospital records indicating Plaintiff had resumed his Vicodin use were not erroneous, contrary to Plaintiff's suggestion, Plaintiff's addiction to a controlled substance could easily be regarded as current under the MHRA, as he would have relapsed. However, Plaintiff maintains that the hospital records are in error as he was using Tramadol, not Vicodin. Although Tramadol is a prescription painkiller, as noted by Defendants [ECF No. 45, at 3-4], they do not allege that it is a 'controlled substance."[22] Therefore, construing the evidence favorably to

---

[22]Tramadol hydrochloride is the generic name for a prescription drug, Ultram. Ultram is a synthetic opioid analgesic that is indicated for the management of moderate to moderately severe chronic pain. *Physicians' Desk Reference* 2693 (64th ed. 2010). *See Hamauei v. Astrue*, No. 10-85, 2010 WL 5900399, at *7 (E.D. La. Oct. 12, 2010). According to the official website of the DEA Office of Diversion Control, neither Tramadol nor Ultram is currently regulated as a

Plaintiff, the Court finds there is a genuine dispute as to the accuracy of the hospital records, and whether Plaintiff resumed using a controlled substance in October. Furthermore, the Court also finds that there is a genuine issue surrounding the success of Plaintiff's rehab. As noted by Defendants, it is undisputed that when he checked himself out of rehab, his participation was regarded as "erratic" and his prognosis was "poor." Plaintiff , however, claims he has not been addicted to any medication since rehab, and that he was properly discharged. [ECF No. 41, at ¶31, 33]. Therefore, a genuine issue of material fact exists as to whether Plaintiff "successfully completed a supervised drug rehabilitation program." *See* Mo. Rev. Stat. § 213.010(4).

Summary judgment is proper if the disability discrimination plaintiff fails to establish any element of his or her prima facie case. *Nesser v. Trans World Airlines, Inc.*, 160 F.3d 442, 445 (8th Cir. 1998). If Plaintiff had a current addiction to a controlled substance, his claim would be barred under the MHRA. As Plaintiff cannot be deemed by the Court to have been currently using a controlled substance at the time of his adverse employment action, there is a genuine issue of fact as to whether Plaintiff has a cognizable disability under the MHRA, and summary judgment will be denied as to Count I.

### B. Count II - Wrongful Termination

Plaintiff alleges that Defendants wrongfully terminated him in retaliation for taking medical leave under the FMLA. [ECF No. 40, at 8].[23] Under the FMLA, eligible employees are entitled

controlled substance. *See* http://www.deadiversion.usdoj.gov/schedules/orangebook/c_cs_alpha.pdf. Missouri has adopted a variation of the Uniform Controlled Substances Act, under the name "Comprehensive Drug Control Act of 1989. V.A.M.S. §§ 195.005 et seq. The statutory list of controlled substances is extensive. V.A.M.S. §§ 195.017. Upon examination of the list of scheduled substances at § 195.017, it appears that neither Tramadol, nor Ultram is included as a controlled substance.

[23]Plaintiff maintains that his demotion led to his termination, as it resulted in a loss of his union seniority due to his transfer from the Capital District to the Little Dixie District. Under the

to "up to twelve weeks of unpaid leave during a twelve-month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." *Murphy v. FedEx Nat'l LTL, Inc.,* 618 F.3d 893, 898 (8th Cir. 2010) (quoting 29 U.S.C. § 2612(a)(1)(D)). Here, it is undisputed that Plaintiff was entitled to FMLA leave. There are two types of claims under the FMLA: "interference and retaliation." *Estrada v. Cypress Semiconductor (Minn.) Inc.,* 616 F.3d 866, 871 (8th Cir. 2010). In the instant Motion, Plaintiff asserts a retaliation claim.

Absent direct evidence, Plaintiff's FMLA retaliation claim is evaluated under the *McDonnell Douglas* burden-shifting framework. *Chappell v. Bilco Co.* 675 F.3d 1110, 1116 - 1117 (8th Cir. 2012) (citing *Wierman v. Casey's Gen'l Stores*, 638 F.3d 984, 999 (8th Cir. 2011)). To establish a prima facie case, Plaintiff must show that 1) she engaged in protected conduct; 2) she suffered a materially adverse employment action; and 3) the materially adverse action was causally linked to the protected conduct. *Id.* at 1117. If Plaintiff establishes a prima facie case, the burden shifts to Defendant to "promulgate a non-discriminatory, legitimate justification for its conduct," and then back to Plaintiff, to "either introduce evidence to rebut the employer's justification as a pretext for discrimination, or introduce additional evidence proving actual discrimination." *Id.* (citing *Sprenger v. Fed. Home Loan Bank of Des Moines,* 253 F.3d 1106, 1111 (8th Cir. 2001)).

Defendants first contend that Plaintiff cannot satisfy the third prong of his prima facie case, that Defendants' materially adverse action was causally linked to Plaintiff's protected

---

FMLA, "[a]n employee generally has a right to return to the same position or an equivalent position with equivalent pay, benefits, and working conditions at the conclusion of the leave. The taking of FMLA leave cannot result in the loss of any benefit that accrued prior to the start of the leave." 29 CFR § 825.100. As such, this Court will consider both Plaintiff's demotion and subsequent layoff as adverse actions under the anti-termination provisions of the FMLA.

conduct. Defendants argue that Plaintiff's layoff resulted from budget cuts and Plaintiff's loss of union seniority, not his protected leave of absence. Defendants state that there is no temporal proximity or plausible connection between Plaintiff's leave and his layoff. [ECF No. 34, at 12]. Defendants further argue that even if Plaintiff can establish the third prong, that they have promulgated a non-discriminatory justification for Plaintiff's demotion and resulting layoff. Defendants maintain that Davis's non-discriminatory complaints about Plaintiff's performance caused Risch concern that Shade Tree's relationship with Ameren in the Capital District could be in jeopardy. [ECF No. 34, at 6]. After the quarterly performance meeting, at which Ameren's Beerman and Davis communicated their concerns about Plaintiff, Defendants state that Risch decided to demote Plaintiff out of fear that Ameren would terminate Shade Tree's work in Plaintiff's district. *Id.* Further, Defendants again allege that Plaintiff's subsequent layoff stemmed from Ameren's undisputed budget overruns, which necessitated staffing cuts at Shade Tree, coupled with Plaintiff's loss of union seniority. *Id.* at 12.

Assuming Plaintiff has established a prima facie case with respect to her termination, and that Defendant has articulated a legitimate reason for its action, "the burden shifts back to the plaintiff to identify evidence sufficient to create a genuine issue of material fact whether [the employer's] proffered explanation is merely a pretext for unlawful retaliation." *Chappel*, 675 F.3d at 1117 (quoting *Blakley v. Schlumberger Tech. Corp.,* 648 F.3d 921, 934 (8th Cir. 2011)). Defendants contend that Plaintiff has not and cannot show any facts or evidence that retaliation for his taking of FMLA leave was the true motivation for his demotion or termination. [ECF No. 34, at 3].

Plaintiff argues that the evidence demonstrates circumstances that give rise to an inference that Plaintiff's demotion was in retaliation for taking medical leave. [ECF No. 40, at 9]. Plaintiff

first offers a temporal observation, emphasizing that no adverse action was taken until after Risch was informed of Plaintiff's addiction and rehab. *Id.* Additionally, Plaintiff notes that it is undisputed that Bishop told Plaintiff prior to his demotion that his job may not be secure because of the time he had taken off as leave. [ECF Nos. 40, at 9; 46, at ¶ 45; 40-1, at 54]. It is also undisputed that Bishop told Plaintiff that he could not be trusted to investigate a work-related incident because of Plaintiff's medical leave and drug addiction. [ECF Nos. 40, at 10; 46, at ¶46]. Plaintiff contends that an inference of retaliation is further supported by an email, in which it is undisputed that Bishop concedes Plaintiff's demotion relates to Plaintiff's communication around his leave and "other issues." [ECF Nos. 40, at 10; 35, 42 at ¶ 83].[24] In addition to his demotion, Plaintiff further argues that his *layoff* was retaliatory, and that Defendant's argument that Plaintiff was part of a larger reduction in force was merely pretextual. *Id.* at 10. Furthermore, Plaintiff alleges that Shade Tree supervisor, Kerri Halker, told him he would never work at Shade Tree again due to his drug problem, suggesting animus. [ECF No. 46, at 11].

First, the Court concludes that Plaintiff has alleged sufficient facts to support a prima facie case of retaliation under the FMLA, including the causal connection between his protected

---

[24]In an email exchange on September 5, 2011, the Monday following his demotion, Plaintiff asked, "Am I being demoted because of the two weeks for my personal leave I took off that you and [Beerman] talked about a week ago?" [ECF Nos. 35, 42 at ¶ 82]. Bishop replied, "Not really / More about the communication around it and other issues / Suggest that is where the correction should begin." *Id.* at ¶ 83. Defendants argue that this statement, under the FMLA and Eight Circuit precedent, actually establishes an *absence* of pretext, as under the FMLA, *lack of notice* (not the absences themselves) constitutes permissible grounds for termination. However, the Court, upon review of the facts, notes that Plaintiff gave Defendant notice on June 20, 2011, one day before going into rehab on June 21, 2011. Under the FMLA, "notice must be given as soon as practicable," which means "as soon as both possible and practical, taking into account all of the facts and circumstances in the individual case. . . . When an employee becomes aware of a need for FMLA leave less than 30 days in advance, it should be practicable for the employee to provide notice of the need for leave either the same day or the next business day." 29 CFR 835.302(a)-(b). As Plaintiff notified Defendant "the same day or the next business day," the Court finds Plaintiff's notification timely under the FMLA.

conduct and his demotion. The Court also finds that Plaintiff establishes sufficient evidence of intentional retaliation for a jury to believe his allegations, and find that Defendants' proffered explanation for Plaintiff's demotion and layoff was not the "true motivating explanation." *See Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1052 (8th Cir. 2006); *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1121 (8th Cir. 2006) (showing pretext by rebutting the employer's ultimate factual claim regarding the absence of retaliatory intent). Although Defendants establish a non-discriminatory justification for both Plaintiff's demotion and layoff, it is undisputed that Plaintiff's immediate supervisor, Bishop, told him that his leave could result in adverse action. As such, the Court finds that there is a genuine issue of material fact as to whether Defendants' proffered reason for their adverse actions was pretextual, and summary judgment is precluded on Plaintiff's FMLA claim.[25]

### C. Count III - Slander

Plaintiff alleges that Defendant Bishop made false and defamatory statements, which he published willfully and maliciously to third parties to discredit and destroy Plaintiff's general reputation. [ECF Nos. 1, at 10-11; 40, at 11]. To prevail under Missouri defamation law, a plaintiff must establish the following in a defamation claim: "1) publication, 2) of a defamatory statement, 3) that identifies the plaintiff, 4) that is false, 5) that is published with the requisite degree of fault, and 6) damages the plaintiff's reputation." *State ex rel. BP Products North Am. Inc. v. Ross*, 163 S.W.3d 922, 929 (Mo. 2005) (citing *Overcast v. Billings Mut. Ins. Co.*, 11 S.W.3d 62, 70 (Mo. banc 2000)).

---

[25]The Court need not reach Defendants' various arguments surrounding Plaintiffs layoff, including disputes over Plaintiff's union seniority and the genuineness of the reduction, as summary judgment on Plaintiff's FMLA claim has been denied on other grounds.

Plaintiff contends that Bishop made statements to Shade Tree employees, "falsely attacking Plaintiff, and to Ameren employees." [ECF No. 40, at 12]. In order to establish Bishop's publication of defamatory statements to third parties, resulting in deteriorating relationships, Plaintiff testifies that Shawn Durant, Shade Tree employee, called Plaintiff a "f---ing liar" after his demotion, even though he and Plaintiff had previously enjoyed a good working relationship. *Id.* Plaintiff further contends that Bishop's "knowingly false statements" resulted in Plaintiff's demotion, termination, and loss of income. *Id.* at 13. Because Bishop did not clarify that Plaintiff's rehab was for prescription drugs, Plaintiff argues that it would lead a reasonable person to infer that hisdetox was for illegal drug use and addiction. *Id.* Plaintiff states that Bishop's incomplete statements were "made with requisite fault" to injure Plaintiff's standing and character. *Id.* Plaintiff also alleges that Bishop made statements to Shade Tree employee, James Ferguson, that were false and defamatory. *Id.* Plaintiff states that Ferguson conveyed that Bishop told him that Plaintiff had improperly documented his time, stolen Shade Tree equipment, not completed enough work, and failed to appropriately request vacation days. [ECF No. 46, at ¶ 47]. Ferguson also told Plaintiff that if Plaintiff had not been on drugs, stolen company equipment, and lied to everyone, he might still be supervisor. [ECF No. 46, at ¶ 50]. Plaintiff contends these statements are false, but admits he did not hear *Bishop* say them, and he does not know of anyone else to whom Bishop made the statements. [ECF Nos. 35, 42, at ¶ 89].[26]

Defendants argue in their Motion, that Plaintiff's slander claim must fail as the record contains no admissible evidence that Bishop told anyone that Plaintiff was addicted to, or sought

---

[26]Plaintiff also alleges statements made by Shade Tree employees, Kerri Halker and James Graefe. [ECF No. 40, at 14]. However, the Court notes that the alleged statements, while constituting the opinion of the employee speaking, unlike Ferguson's, do not indicate that they originated from a defamatory statement made by Bishop. As such, the Court may not consider them as defamation attributable to Bishop.

treatment for *illegal* drugs. [ECF No. 34, at 3].  Furthermore, Defendants argue that any statements Bishop made about Plaintiff's actual treatment are not actionable because they are true. [ECF No. 34, at 3].  In any defamation case, the truth of the allegedly defamatory statement may be submitted as evidence, Mo. Const. art. I, § 8, and the Missouri supreme court has interpreted that to mean that the truth is an *absolute* defense to a defamation claim.  *Nigro v. St. Joseph Medical Center*, 371 S.W.3d 808, 818 (Mo. App. W.D. 2012) (citing *Rice v. Hodapp*, 919 S.W.2d 240, 243 (Mo. banc 1996)).

It is undisputed that Bishop told Beerman (at Ameren), Risch and the president of Shade Tree that Plaintiff had been in rehab/detox.  Plaintiff alleges that Bishop told other Shade Tree employees that he had been in detox as well.  These statements cannot be deemed defamatory as it is undisputed that *they are true*.  The Court finds that there is no evidence Bishop told anyone that Plaintiff had used *illegal* drugs.  Plaintiff's contention that Shawn Durant called Plaintiff a "f---ing liar" after his demotion, does not constitute reliable evidence that Bishop falsely attacked Plaintiff. The Court concludes that Plaintiff simply has failed to provide evidence that Bishop promulgated "knowingly false statements" about Plaintiff's addiction, resulting in his demotion, termination, and loss of income.

It is also undisputed, however, that Bishop did not indicate to anyone that Plaintiff's leave was related to *prescription* drug use.  Plaintiff contends that this would lead a reasonable person to infer that his detox was for illegal drugs.  He contends that Bishop created this inference knowingly to damage Plaintiff's standing and character.  For the purposes of defamation, it does not matter whether a statement was made in bad faith, so long as it was true.  *Rice*, 919 S.W.2d at 243; Restatement (Second) of Torts § 581A cmt. a (1977) ("There can be no recovery in defamation for a statement of fact that is true, although the statement is made for no good purpose

and is inspired by ill will toward the person about whom it is published and is made solely for the purpose of harming him."). The test to be administered in evaluating the defense of truth is whether the challenged statement is substantially true. *Turnbull v. Herald Co.,* 459 S.W.2d 516, 519 (Mo.App.1970). It is not necessary that the precise facts disclosed be literally true. *Id.* Slight inaccuracies are immaterial if the allegedly defamatory charge is true in substance. *Id.*; *see also Cockram v. Genesco, Inc.,* 2010 U.S. Dist. LEXIS 142521, at *8 (W.D. Mo. Dec. 9, 2010) (applying Missouri's "substantial truth" standard to an employer's written statements about a former employee). "A person is not bound to exact accuracy in his statements about another, if the statements are essentially true." *Thurston v. Ballinger,* 884 S.W.2d 22, 26–27 (Mo.App. W.D.1994) (applying the "substantial truth" standard, but finding that the defendant's oral statements were not substantially true). Thus, Bishop's failure to indicate the precise reason for Plaintiff's detox, his addiction to prescription drugs, does not satisfy the element of defamation requiring a *false* statement. Bishop's statements were substantially true. In addition, the Court finds that Plaintiff has presented no evidence that Bishop's comments about his detox actually resulted in an inference by any person that illegal drugs were involved. He also offers no evidentiary support for his allegation that Bishop intended to create this inference. As such, there is an absence of a genuine issue of material fact as to Plaintiff's allegations of slander by Bishop surrounding his detox and Defendants are entitled to judgment as a matter of law.

The Court also finds that Plaintiff's allegations of defamation, based on statements made by supervisor James Ferguson, are likewise not actionable. It is undisputed that Ferguson stated that Bishop told him Plaintiff improperly documented his time, stole Shade Tree equipment, did not complete work, or appropriately request vacation days. Plaintiff contends these statements are false. However, the Court finds that Plaintiff has not established a genuine issue of fact as to

whether these statements *damaged* Plaintiff. Ferguson made his statements after Plaintiff had already been demoted. [ECF 40-1, at 86]. Furthermore, although Defendants do not dispute that Ferguson himself *attributed* the statements to Bishop, they point out that there is no direct evidence that Bishop actually published them. Nor does the record reflect evidence other than Plaintiff's conclusory assertion.

Therefore, Plaintiff has failed to demonstrate the existence of specific facts creating a genuine issue for trial. As such, there is an absence of a genuine issue of material fact as it relates to the elements of defamation under Missouri law, and summary judgment will be granted as to Plaintiff's slander claim on Count III.

## IV. CONCLUSION

The Court finds that summary judgment shall be granted as to Count III, alleging that Defendant Bishop made false and defamatory statements. However, the Court finds that a genuine issue of material fact exists with regard to Count I, alleging violations of the Missouri Human Rights Act, and Count II, Plaintiff's wrongful termination claim under the FMLA, and therefore, summary judgment will be denied.

Accordingly,

Defendants' Motion for Summary Judgment [ECF No. 33] will be **GRANTED** as to Count III of Plaintiff's complaint, and **DENIED** as to Count I and II .

So Ordered this 26th day of July, 2013.

_____
E. RICHARD WEBBER
SENIOR UNITED STATES DISTRICT JUDGE